# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

| | |
|---|---|
| ERNEST PERKINS, on behalf of himself and all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| WELLDYNERX, LLC, | **JURY TRIAL** |
| Defendant. | **DEMANDED** |

Plaintiff, Ernest (Ed) Perkins ("Plaintiff"), through his attorneys, brings this Class Action Complaint against the Defendant, WellDyneRx, LLC ("WellDyne" or "Defendant"), alleging as follows:

## INTRODUCTION

1. WellDyne, is a pharmacy benefit manager (PBM) that assists chronically ill consumers with their prescription medication needs. WellDyne fills more than 15 million prescriptions per year, partners with 2,000 clients and serves more than 3 million members.

2. Starting on October 30, 2021, WellDyne lost control over at least 38,000 of its patients' highly sensitive medical and personal information in a data

breach by cybercriminals ("Data Breach"). The Data Breach compromised the personally identifiable information ("PII") and personal health information ("PHI") of patients in its system, meaning patients are at risk of identity theft and harm. Cybercriminals could steal patient data because WellDyne did not adequately protect and secure patient PII and PHI, leaving the data an unguarded target for theft and misuse. Mr. Perkins was a victim of the Data Breach and brings this Class Action on behalf of himself and all patients harmed by WellDyne's conduct.

3.      On December 2, 2021, WellDyne learned that cybercriminals had breached its email system and potentially accessed consumers' PII and PHI. WellDyne internally investigated the breach for over three months but has failed to identify exactly what the cybercriminals stole and from which patients. But the investigation did reveal that hackers started accessing WellDyne's systems on October 30, 2021, and had access to these systems through November 11, 2021.

4.      Due to WellDyne's inability to detect and prevent the Data Breach earlier, cybercriminals had access to patients' highly sensitive PII and PHI, including patient names, dates of birth, Social Security numbers, driver's license numbers, treatment information, health insurance information, contact information, prescription information and other medical/health information.

5.      WellDyne's inability to (i) safeguard patients' highly sensitive PII and PHI; (ii) determine the scale of the Data Breach; and (iii) promptly notify its patients

of the breach violates Florida law and WellDyne's implied contract with patients to safeguard their PII and PHI.

6.      Mr. Perkins and class members face a lifetime risk of identity theft due to the nature of the information lost, including patients' dates of birth and Social Security numbers, which they cannot change.

7.      WellDyne's harmful conduct has injured Mr. Perkins and class members in multiple ways, including: (i) the lost or diminished value of their PII and PHI; (ii) costs associated with the prevention, detection, and recovery from identity theft, tax fraud, and other unauthorized use of their data; (iii) lost opportunity costs to mitigate the Data Breach's consequences, including lost time; and (iv) emotional distress associated with the loss of control over their highly sensitive PII and PHI.

8.      WellDyne's failure to protect patients' PII and PHI violates Florida law and harms hundreds of thousands of patients, causing Mr. Perkins to seek relief on a class wide basis.

## PARTIES

9.      Plaintiff, Ernest Perkins is a resident and citizen of Nevada. Mr. Perkins intends to remain domiciled in Minden, Nevada indefinitely and maintains his true, fixed, and permanent home in that state.

10.     WellDyne is a Florida limited liability company registered to do business in the state of Florida with its principal place of business located at 500

Eagles Landing Drive, Lakeland, FL 33810.

## JURISDICTION & VENUE

11.     This Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action in which the amount in controversy exceeds $5 million, exclusive of costs and interest, there are more than 100 members in the proposed class, and at least one class member is a citizen of a different state than WellDyne, establishing minimal diversity.

12.     This Court has personal jurisdiction over WellDyne because it is registered to do business in Florida and its headquarters are in Lakeland, Florida.

13.     Venue is proper in this Court under 28 U.S.C. §§ 1391 because a substantial part of the alleged wrongful conduct and events giving rise to the claims occurred in this District and because WellDyne conducts business in this District.

## FACTUAL ALLEGATIONS

### A.     WellDyne

14.     WellDyne provides PBM and pharmaceutical services to employers, hospitals and health systems, unions, state and local governments, third-party administrators, and health plans. Working with these clients, WellDyne is entrusted with the PII and PHI of millions of patients.

15.     In performing these services, WellDyne requires patients to provide their highly sensitive PII and PHI, including patient names, dates of birth, Social

Security numbers, driver's license numbers, treatment information, health insurance information, contact information, prescription information and other medical/health information.

16.     WellDyne promises to safeguard patients' PII and PHI as part of its services, providing patients its "Notice of Privacy Practices" (the "Privacy Notice").[1]

17.     The Privacy Notice explains how WellDyne collects patient data as part of its services:

> WellDyneRx, LLC (Provider) is required by law to maintain the privacy of protected health information, to provide individuals with notice of its legal duties and privacy practices with respect to protected health information, and to notify affected individuals following a breach of unsecured protected health information. Provider is required to follow the terms of the notice of privacy practices (Notice) which is currently in effect. Provider reserves the right to change the terms of this Notice, the practices described within this Notice, and to make the Notice effective for any protected health information maintained by Provider.

18.     WellDyne's Privacy Notice recognizes WellDyne's duty to secure and maintain patient PII and Health Information and use it only in delivering WellDyne's services:[2]

---

[1] *See* WellDyne's Notice of Privacy Practices, https://welldyne.com/notice-of-privacy-practices/ (last visited August 23, 2022)

[2] *Id.*

Protected health information is health information created or received by a health care provider, health plan, employer, or health care clearinghouse. Provider may act as each of the above business types. Protected health information is used by Provider in many ways while performing normal business activities. Your protected health information may be used or disclosed by Provider for purposes of treatment, payment and health care operations.

19.    Mr. Perkins and the proposed class are current and former patients who received pharmacy-related services through WellDyne.

20.    As a condition of providing such services, WellDyne required Mr. Perkins and the proposed class to provide their PII and PHI.

21.    WellDyne then collected and maintained patients' PII and PHI in its computer systems.

22.    In collecting and storing patients' PII and PHI, WellDyne implied that it would protect and maintain their data according to state and federal law and its Privacy Notice.

23.    Mr. Perkins and the proposed class relied on WellDyne's representations in agreeing to provide their PII and PHI.

**B.    WellDyne fails to safeguard patients' PII and PHI**

24.    On October 30, 2021, WellDyne lost control of patients' PII and PHI to cybercriminals in the Data Breach. Due to inadequate systems to safeguard patient data, WellDyne was unaware of the breach for over a month, allowing cybercriminals to pilfer patients' PII and PHI undetected.

25.     On December 2, 2021, WellDyne finally discovered the Data Breach and allegedly began taking measures to stop it. But through an internal investigation, WellDyne was unable to determine the exact information cybercriminals stole and from which patients.

26.     It took WellDyne more than six months –*until early July 2022*—to alert Mr. Perkins that his PHI and PII may have been compromised in the Data Breach. On or about July 8, 2022, Mr. Perkins learned about the Data Breach after WellDyne issued a Notice of Data Privacy Event ("Breach Notice"). A true and correct copy of the Breach Notice is attached as **Exhibit A**.

27.     The Breach Notice reiterated that "The confidentiality, privacy, and security of personal information within our care is among our highest priorities." *Id.*

28.     The Breach Notice explained that WellDyne lost control over patient "names, dates of birth, Social Security numbers, driver's license numbers, treatment information, health insurance information, contact information, prescription information and other medical/health information." *Id.*

29.     The Breach Notice said WellDyne "secured the compromised account and investigated to identify any individuals that were affected. We have taken additional steps to improve security and better protect against similar incidents in the future." *Id.*

30.     However, recognizing the severity of what occurred, WellDyne also advised its patients to "remain vigilant against incidents of identity theft and fraud buy reviewing your account statements, explanation of benefits forms and monitoring your free credit reports for suspicious activity and to detect errors." *Id*.

31.     On information and belief, WellDyne failed to adequately train its employees on reasonable cybersecurity protocols or implement reasonable security measures, causing it to lose control over patients' PII and PHI. WellDyne's negligence is evidenced by its failure to recognize the Data Breach for over a month while cybercriminals had access to patient data, meaning WellDyne had no effective means to detect and prevent attempted data breaches. Further, the Breach Notice—sent to patients *six months after* the Data Breach was discovered—makes clear that WellDyne cannot even determine the full scope of the Data Breach, as it has been unable to determine exactly what information was stolen and when.

**C.     Plaintiff's experience**

32.     Mr. Perkins received pharmaceutical benefit services from WellDyne through his health insurance provider.

33.     As a condition of receiving WellDyne's services, WellDyne required Mr. Perkins to provide his PII and PHI.

34.     Mr. Perkins believed, in conjunction with using WellDyne's pharmaceutical services under his health plan, that a portion of his health insurance

premium payments would be allocated for data security. Had Mr. Perkins known that WellDyne did not utilize reasonable data security measures, he would have paid less for those services.

35.     On or about July 8, 2022, Mr. Perkins received notice from WellDyne that his PII and PHI were compromised by the Data Breach.

36.     In response, Mr. Perkins has spent considerable time and effort monitoring his accounts to protect himself from additional identity theft. Mr. Perkins fears for his personal financial security and uncertainty over what medical information was revealed in the Data Breach. He is experiencing feelings of anxiety, sleep disruption, stress, and fear because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

37.     Mr. Perkins suffered actual injury in the form of damages to and diminution in the value of his PII and PHI—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and as a result of the Data Breach.

38.     Mr. Perkins has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII and PHI being placed in the hands of unauthorized third parties and possibly criminals.

39.    WellDyne's proposed fix, a credit monitoring service, is inadequate to address Mr. Perkins' losses, as he faces a risk of identity theft for the rest of his life.

40.    Had Mr. Perkins known that WellDyne does not adequately protect PII and PHI, he would not have entrusted WellDyne with his PII and PHI.  Furthermore, Plaintiff's sensitive PII and PHI remains in WellDyne's possession without adequate protection against known threats, exposing Mr. Perkins to the prospect of additional harm in the event WellDyne suffers another data breach.

**D.     Mr. Perkins and the proposed class face significant risk of identity theft**

41.    Mr. Perkins and members of the proposed class have suffered injury from the misuse of their PII and PHI that can be directly traced to WellDyne.

42.    The ramifications of WellDyne's failure to keep Plaintiff's and the Class's PII and PHI secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, or other information, without permission, to commit fraud or other crimes.

43.    According to experts, one out of four data breach notification recipients become a victim of identity fraud.

44.    Because WellDyne failed to prevent the Data Breach, Mr. Perkins and the proposed Class have suffered and will continue to suffer damages, including

monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

a.   The loss of the opportunity to control how their PII and PHI are used;

b.   The diminution in value of their PII and PHI;

c.   The compromise and continuing publication of their PII and PHI;

d.   Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

e.   Lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

f.   Delay in receipt of tax refund monies;

g.   Unauthorized use of stolen PII and PHI; and

h.   The continued risk to their PII and PHI, which remains in the possession of WellDyne and is subject to further breaches so long as WellDyne fails to undertake the appropriate measures to protect the PII and PHI in their possession.

45.   Stolen PII and PHI is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring

service, stolen PHI can be worth up to $1,000.00 depending on the type of information obtained.

46.    The value of Plaintiff's and the proposed Class's PII and PHI on the black market is considerable. Stolen PII and PHI trades on the black market for years, and criminals often post stolen private information openly on various "dark web" internet websites, like Marketo, making the information publicly available, for a fee.

47.    It can take victims years to spot identity or PII and PHI theft, giving criminals time to sell that information for cash.

48.    One such example of criminals using PII and PHI for profit is the development of "Fullz" packages.

49.    Cybercriminals can cross-reference multiple sources of PII and PHI to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

50.    The development of "Fullz" packages means that stolen PII and PHI from the Data Breach can easily be used to link and identify it to Plaintiff's and the proposed Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII and PHI stolen by

the cybercriminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and other members of the proposed Class's stolen PII and PHI is being misused, and that such misuse is fairly traceable to the Data Breach.

51.     According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, leading to more than $3.5 billion in losses to individuals and business victims.

52.     Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."

53.     Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

54.     Along with out-of-pocket expenses that can exceed thousands of dollars for the victim of new account identity theft, and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their PHI and PII. Victims of new account identity theft will likely have

to spend time correcting fraudulent information in their credit reports and continually monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

55.     Further complicating the issues faced by victims of identity theft, data thieves may wait years before trying to use the stolen PII and PHI. To protect themselves, Plaintiff and the proposed Class will need to remain vigilant against unauthorized data use for years or even decades to come.

56.     The Federal Trade Commission ("FTC") has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner, Pamela Jones Harbour, stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."

57.     The FTC has also issued several guidelines for businesses that highlight reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making. According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; (5) using industry-tested and accepted methods for securing data; (6)

monitoring activity on networks to uncover unapproved activity; (7) verifying that privacy and security features function properly; (8) testing for common vulnerabilities; and (9) updating and patching third-party software.

58.    According to the FTC, unauthorized PHI disclosures are extremely damaging to consumers' finances, credit history, and reputation, and can take time, money, and patience to resolve the fallout. The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

59.    To that end, the FTC has issued orders against businesses that failed to employ reasonable measures to secure sensitive payment card data. *See In the matter of Lookout Services, Inc.*, No. C-4326, ⁋ 7 (June 15, 2011) ("[Defendant] allowed users to bypass authentication procedures" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks, such as employing an intrusion detection system and monitoring system logs."); *In the matter of DSW, Inc.*, No. C-4157, ⁋ 7 (Mar. 7, 2006) ("[Defendant] failed to employ sufficient measures to detect unauthorized access."); *In the matter of The TJX Cos., Inc.*, No. C-4227 (Jul. 29, 2008) ("[R]espondent stored . . . personal information obtained to verify checks and process unreceipted returns in clear text on its in-store and corporate networks[,]" "did not require network administrators . . . to use different

passwords to access different programs, computers, and networks[,]" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks . . ."); *In the matter of Dave & Buster's Inc.*, No. C-4291 (May 20, 2010) ("[Defendant] failed to monitor and filter outbound traffic from its networks to identify and block export of sensitive personal information without authorization" and "failed to use readily available security measures to limit access between instore networks . . ."). These orders, which all preceded the Data Breach, further clarify the measures businesses must take to meet their data security obligations.

### E. WellDyne Failed to Adhere to HIPAA

60.    HIPAA circumscribes security provisions and data privacy responsibilities designed to keep patients' medical information safe. HIPAA compliance provisions, commonly known as the Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of protected health information.

61.    HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PHI is properly maintained.

62.    The Data Breach itself resulted from a combination of inadequacies showing WellDyne failed to comply with safeguards mandated by HIPAA. WellDyne's security failures include, but are not limited to:

a. Failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains and transmits in violation of 45 C.F.R. § 164.306(a)(1);

b. Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

c. Failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

d. Failing to ensure compliance with HIPAA security standards by WellDyne's workforce in violation of 45 C.F.R. § 164.306(a)(4);

e. Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f. Failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

g.  Failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

h.  Failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i.  Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

## F. WellDyne Failed to Adhere to FTC Guidelines

63.    According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.  To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as WellDyne, should employ to protect against the unlawful exposure of PII.

64.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental

data security principles and practices for business.   The guidelines explain that businesses should:

   a.  protect the personal customer information that they keep;

   b.  properly dispose of personal information that is no longer needed;

   c.  encrypt information stored on computer networks;

   d.  understand their network's vulnerabilities; and

   e.  implement policies to correct security problems.

65.   The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

66.   The FTC recommends that companies not maintain PHI longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

67.   The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from

these actions further clarify the measures businesses must take to meet their data security obligations.

68.     WellDyne's failure to employ reasonable and appropriate measures to protect against unauthorized access to patient PHI constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

## CLASS ACTION ALLEGATIONS

69.     Mr. Perkins sues on behalf of himself and the proposed class ("Class") under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), defined as follows:

> All individuals residing in the United States whose personal information was compromised in the Data Breach disclosed by WellDyne in July 2022.

Excluded from the Class are WellDyne, its agents, affiliates, parents, subsidiaries, any entity in which WellDyne has a controlling interest, any WellDyne officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

70.     Mr. Perkins reserves the right to amend the class definition.

71.     This action satisfies the numerosity, commonality, typicality, and adequacy requirements under Fed. R. Civ. P. 23.

a.     **Numerosity**. Mr. Perkins is a representative of the proposed Class consisting of thousands of members—far too many to join in a single action;

b.  **Ascertainability**. Class members are readily identifiable from information in WellDyne's possession, custody, and control;

c.  **Typicality**. Mr. Perkins' claims are typical of Class member's claims as each arises from the same Data Breach, the same alleged negligence and statutory violations by WellDyne, and the same unreasonable manner of notifying individuals about the Data Breach.

d.  **Adequacy**. Mr. Perkins will fairly and adequately protect the proposed Class's interests. His interests do not conflict with Class members' interests, and he has retained counsel experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf, including as lead counsel.

e.  **Commonality**. Mr. Perkins' and the Class's claims raise predominantly common fact and legal questions that a class wide proceeding can answer for all Class members. Indeed, it will be necessary to answer the following questions:

    i.  Whether WellDyne had a duty to use reasonable care in safeguarding Mr. Perkins and the Class's PII and PHI;

    ii.  Whether WellDyne failed to implement and maintain reasonable security procedures and practices appropriate to the

nature and scope of the information compromised in the Data Breach;

iii.   Whether WellDyne was negligent in maintaining, protecting, and securing PII and PHI;

iv.   Whether WellDyne breached contractual promises to safeguard Mr. Perkins and the Class's PII and PHI;

v.   Whether WellDyne took reasonable measures to determine the extent of the Data Breach after discovering it;

vi.   Whether WellDyne's Breach Notice was reasonable;

vii.   Whether the Data Breach caused Mr. Perkins and the Class injuries;

viii.   What the proper damages measure is;

ix.   Whether WellDyne violated the statutes alleged in this complaint; and

x.   Whether Mr. Perkins and the Class are entitled to damages, treble damages, or injunctive relief.

72.   Further, common questions of law and fact predominate over any individualized questions, and a class action is superior to individual litigation or any other available method to fairly and efficiently adjudicate the controversy. The

damages available to individual plaintiffs are insufficient to make individual lawsuits economically feasible.

## FIRST CLAIM FOR RELIEF
### Negligence
### (On Behalf of Plaintiff and the Class)

73.     Plaintiff incorporates all previous paragraphs as if fully set forth below.

74.     Plaintiff and members of the Class entrusted their PII and PHI to Defendant. Defendant owed to Plaintiff and other members of the Class a duty to exercise reasonable care in handling and using the PII and PHI in its care and custody, including implementing industry-standard security procedures sufficient to reasonably protect the information from the Data Breach, theft, and unauthorized use that happened, and to promptly detect attempts at unauthorized access.

75.     Defendant owed a duty of care to Plaintiff and members of the Class because it was foreseeable that Defendant's failure to adequately safeguard their PII and PHI in accordance with state-of-the-art industry standards for data security would result in the compromise of that PII and PHI—just like the Data Breach that ultimately happened. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and members of the Class's PII and PHI by disclosing and providing access to this information to third parties and by failing to properly supervise both the way the PII and PHI was stored, used, and exchanged, and those in its employ who made that happen.

76.     Defendant owed to Plaintiff and members of the Class a duty to notify them within a reasonable time frame of any breach to the security of their PII and PHI. Defendant also owed a duty to timely and accurately disclose to Plaintiff and members of the Class the scope, nature, and occurrence of the Data Breach. This duty is required and necessary for Plaintiff and members of the Class to respond appropriately to protect their PII and PHI, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

77.     Defendant owed these duties to Plaintiff and members of the Class because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security protocols. Defendant actively sought and obtained Plaintiff's and members of the Class's PII and PHI for pharmaceutical services. Plaintiff and members of the Class needed to provide their PII and PHI to Defendant to receive pharmaceutical services from Defendant, and Defendant retained that information.

78.     The risk that unauthorized persons would try to gain access to the PII and PHI and misuse it was foreseeable. Given that Defendant holds vast amounts of PII and PHI, it was inevitable that unauthorized individuals would try to access

Defendant's databases containing the PII and PHI—whether by malware or otherwise.

79.    PII and PHI is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII and PHI of Plaintiff and members of the Class's and the importance of exercising reasonable care in handling it.

80.    Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII and PHI of Plaintiff and members of the Class which actually and proximately caused the Data Breach and Plaintiff's and members of the Class's injury.

81.    Defendant also breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and members of the Class, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff's and members of the Class's injuries-in-fact.

82.    As a direct and traceable result of Defendant's negligence or negligent supervision, Plaintiff, and members of the Class have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

83.     Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff's and members of the Class's actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII and PHI by criminals, improper disclosure of their PII and PHI, lost benefit of their bargain, lost value of their PII and PHI, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

### SECOND CLAIM FOR RELIEF
### Negligence *Per Se*
### (On Behalf of Plaintiff and the Class)

84.     Plaintiff incorporates all previous paragraphs as if fully set forth below.

85.     Defendant had a duty to protect and maintain and provide adequate data security to maintain Plaintiff's and the Class's PII and PHI under § 5 of the FTC Act, 15 U.S.C. § 45.

86.     The FTC Act prohibits unfair business practices affecting commerce, which the FTC has interpreted to include a failure to use reasonable measures to safeguard PII.

87.     Defendant's violation of these duties is negligence *per se* under Florida law.

88.     Plaintiff and the proposed Class are included in the class of persons that

the FTC Act was intended to protect.

89.     The harm the Data Breach caused is the type the FTC Act was intended to guard against.

90.     Defendant's violation of Section 5 of the FTC Act and its failure to comply with applicable laws and regulations constitutes negligence per se.

91.     Pursuant to HIPAA (42 U.S.C. § 1302d, et seq.), Defendant had a duty to implement reasonable safeguards to protect Plaintiff's and Class members' PHI.

92.     Pursuant to HIPAA, Defendant had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 C.F.R. § 164.304 definition of encryption).

93.     Plaintiff and Class members are within the class of persons that the HIPAA was intended to protect.

94.     The harm that occurred because of the Data Breach is the type of harm that HIPAA was intended to guard against. The Federal Health and Human Services' Office for Civil Rights ("OCR") has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures relating to protected health information, caused the same harm as that

suffered by Plaintiff and the Class members.

95.     Defendant breached its duties to Plaintiff and the Class under HIPAA, by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class members' PHI.

96.     Defendant's failure to comply with applicable laws and regulations constitutes negligence per se.

97.     But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and members of the Class, Plaintiff and members of the Class would not have been injured.

98.     The injury and harm suffered by Plaintiff and members of the Class were the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that Defendant was failing to meet its duties and that its breach would cause Plaintiff and members of the Class to suffer the foreseeable harms associated with the exposure of their PHI.

99.     Had Plaintiff and members of the Class known that Defendant did not adequately protect their PHI, Plaintiff and members of the Class would not have entrusted Defendant with their PHI.

100.    Defendant's negligence *per se* caused Plaintiff and the proposed Class actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII and PHI by criminals, improper disclosure of their PII and PHI, lost

benefit of their bargain, lost value of their PII and PHI, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

### THIRD CLAIM FOR RELIEF
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

101.   Plaintiff incorporates all previous paragraphs as if fully set forth below.

102.   Defendant offered to provide goods and services to Plaintiff and members of the Class through Defendant's third party clients, including employers, health insurers and others, in exchange for payment.

103.   Defendant required Plaintiff and the members of the Class to provide Defendant with their PII and PHI to receive services.

104.   In turn, and through the Privacy Notice, Defendant agreed it would not disclose the PHI it collects from patients to unauthorized persons. Defendant also impliedly promised to maintain safeguards to protect patients' PII and PHI.

105.   Defendant recognized its implied promise in its Breach Notice, stating that "[t]he confidentiality, privacy, and security of personal information within our care is among our highest priorities."

106.   Plaintiff and the members of the Class accepted Defendant's offer by providing PII and PHI to Defendant in exchange for receiving Defendant's services and by paying for them and receiving the same.

107.   Implicit in the parties' agreement was that Defendant would provide Plaintiff and members of the Class with prompt and adequate notice of all unauthorized access or theft of their PII and PHI.

108.   Plaintiff and the members of the Class would not have entrusted their PII and PHI to Defendant without such agreement with Defendant.

109.   Defendant materially breached the contract(s) it had entered with Plaintiff and members of the Class by failing to safeguard such information and failing to notify them promptly of the intrusion into its computer systems that compromised such information. Defendant also breached the implied contracts with Plaintiff and members of the Class by:

a.     Failing to properly safeguard and protect Plaintiff's and members of the Class's PII and PHI;

b.     Violating industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement;

c.     Failing to ensure the confidentiality and integrity of electronic PII and PHI that Defendant created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1).

110.   The damages sustained by Plaintiff and members of the Class as described above were the direct and proximate result of Defendant's material breaches of its agreement(s).

111.   Plaintiff and members of the Class have performed under the relevant agreements, or such performance was waived by the conduct of Defendant.

112.   The covenant of good faith and fair dealing is an element of every contract. All such contracts impose on each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract along with its form.

113.   Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

114.   Defendant failed to advise Plaintiff and members of the Class of the Data Breach promptly and sufficiently.

115.   In these and other ways, Defendant violated its duty of good faith and fair dealing.

116.   Plaintiff and members of the Class have sustained damages because of Defendant's breaches of its agreement, including breaches of it through violations of the covenant of good faith and fair dealing.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**

**(On Behalf of Plaintiff and the Class)**

117.   Plaintiff and members of the Class incorporate the above allegations as if fully set forth herein.

118.   This claim is pleaded in the alternative to the breach of implied contractual duty claim.

119.   Plaintiff and members of the Class conferred a monetary benefit upon Defendant in the form of monies paid for treatment services.

120.   Defendant appreciated or had knowledge of the benefits conferred upon itself by Plaintiff and members of the Class. Defendant also benefited from the receipt of Plaintiff's and members of the Class's PII and PHI, as this was used to facilitate payment and treatment services.

121.   As a result of Defendant's conduct, Plaintiff and members of the Class suffered actual damages in an amount equal to the difference in value between service costs with reasonable data privacy and security practices and procedures that Plaintiff and members of the Class believed they paying for and the lower costs

associated with services where unreasonable data privacy and security practices and procedures are used.

122.   Under principals of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and members of the Class because Defendant failed to implement (or adequately implement) the data privacy and security practices and procedures for itself that Plaintiff and members of the Class paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

123.   Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and members of the Class all unlawful or inequitable proceeds received by it as a result of the conduct and Data Breach alleged herein.

## PRAYER FOR RELIEF

Plaintiff and members of the Class demand a jury trial on all claims so triable and request that the Court enter an order:

A.   Certifying this case as a class action on behalf of Mr. Perkins and the proposed Class, appointing Mr. Perkins as class representative, and appointing his counsel to represent the Class;

B.   Awarding declaratory and other equitable relief as is necessary to protect the interests of Mr. Perkins and the Class;

C.      Awarding injunctive relief as is necessary to protect the interests of Mr. Perkins and the Class;

D.      Enjoining Defendant from further deceptive and unfair practices and making untrue statements about the Data Breach and the stolen PHI;

E.      Awarding Mr. Perkins and the Class damages that include compensatory, exemplary, punitive damages, and statutory damages, including pre- and post-judgment interest, in an amount to be proven at trial;

F.      Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

G.      Awarding attorneys' fees and costs, as allowed by law;

H.      Awarding prejudgment and post-judgment interest, as provided by law;

I.      Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

J.      Granting such other or further relief as may be appropriate under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED AND DATED this 6th day of September, 2022.

*/s/Avi R. Kaufman*

Avi R. Kaufman (Florida Bar no. 84382)
kaufman@kaufmanpa.com
Rachel E. Kaufman (Florida Bar no. 87406)
rachel@kaufmanpa.com
KAUFMAN P.A.
237 S Dixie Hwy, 4th Floor
Coral Gables, FL 33133
Telephone: (305) 469-5881

Brittany Resch*
TURKE & STRAUSS LLP
613 Williamson St., Suite 201
Madison, WI 53703
T: (608) 237-1775
F: (608) 509-4423
brittanyr@turkestrauss.com

*Attorneys for Plaintiff*